Filed 3/13/14  P. v. Ahlawat CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038838 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1074943) |
| v. | |
| MEENAKSHI AHLAWAT, | |
| Defendant and Appellant. | |

## I.    INTRODUCTION

Defendant Meenakshi Ahlawat appeals after a jury convicted her of inflicting corporal injury on a spouse.  (Pen. Code, § 273.5, subd. (a).[1])  She was placed on probation for three years.

On appeal, defendant contends reversal is required because (1) the jury improperly considered an exhibit that had not been admitted into evidence and (2) the trial court excluded evidence that would have shown why she recanted a prior allegation that her husband had abused her.  She also contends that the cumulative effect of those errors requires reversal, and that she is entitled to two additional days of custody credit.  We will modify the judgment to reflect the two additional days of credit, and we will affirm the judgment as modified.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant has also filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. In her writ petition, defendant argues that she was deprived of the effective assistance of counsel because her attorney failed to investigate and present evidence corroborating her claim that the victim had abused her in the past. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## II.    BACKGROUND

### A.    *General Background Facts*

Rajeev Ahlawat[2] and defendant are both originally from India, where they married and had a son. Rajeev came to the United States in 2000; defendant and their son followed a few months later. The family initially lived in Pennsylvania, but later moved to Virginia and then North Carolina. They had a second son in 2004. In 2007, Rajeev and defendant moved to the City of Santa Clara with their sons.

### B.    *Charged Incident*

The charges were based on defendant's conduct on Sunday, April 11, 2010. According to Rajeev, the incident began two days before that, on a Friday, when defendant asked Rajeev to make her something for dinner. While Rajeev was chopping onions, defendant came into the kitchen, picked up a pan, and told him she would not eat the food he was cooking. She also told Rajeev to leave the kitchen. Rajeev went to his separate bedroom.

The next morning, defendant came into Rajeev's bedroom and yelled at him to clean the dishes. When he refused, defendant told him to leave the house. Rajeev was scared and left. He spent the day at his office. When he returned that evening, defendant said she wanted a divorce, and she took the kids out for the night.

---

[2] Since defendant and Rajeev Ahlawat have the same surname, we will refer to Rajeev by his first name to avoid confusion.

2

On Sunday morning, defendant yelled at Rajeev again, referring to the dishes and the divorce. Rajeev was sitting on his bed; defendant was in the doorway. This time, Rajeev said he would not leave the house. Defendant left the room and returned with a thick glass water pitcher. She told Rajeev that he should leave immediately or she was going to kill him. Rajeev continued to sit on the bed and refused to leave. Defendant then swung the pitcher at Rajeev, hitting his left shin and then his head.

Defendant left with the water pitcher, then returned to the bedroom. She yelled at Rajeev some more and threatened to kill him again. She picked up a drinking glass from a table in the bedroom and hit it on Rajeev's head, causing the glass to break. Rajeev saw blood and "really got scared." Defendant next obtained a plastic jug and used it to hit Rajeev, although he began to block the blows.

Rajeev opened a window and called out for help, saying, "Please come help me! Come, please! [M]y wife is going to kill me." A neighbor called back to him and then came over to the house. Defendant went downstairs and told the neighbor to go away and not get involved, but Rajeev told the neighbor to stay. The neighbor said he had called the police, and officers arrived a few minutes later.

Paramedics treated Rajeev's injuries by cleaning the cut on his head and a cut on his shin.[3] Rajeev also went to see a doctor the following day. The doctor told him that the four-to-five inch cut on his head should have been stitched, but that he had waited too long.

## C.     *Defendant's Interviews*

Defendant was interviewed at her residence by Santa Clara Police Officer Cuong Phan. Defendant appeared calm; she did not seem fearful. Defendant explained that she and Rajeev had argued. During the argument, Rajeev had grabbed her wrist, causing her pain, then pushed her into a closet, causing her further pain. Defendant then grabbed the

---

[3] Pictures of Rajeev's injuries were introduced into evidence.

water pitcher and hit Rajeev in the leg two times, which caused him to let go of her.  She denied hitting Rajeev in any other manner, and she said, "I should not have done it."  She did not know how Rajeev got the cut on his head.

Following her arrest, defendant was interviewed by Santa Clara Police Officer Johnny Fanucchi at the police station.  After waiving her *Miranda* rights,[4] defendant explained that Rajeev had been violent towards her in the past.  There had been five or six incidents in 2009.  She had not reported any of those incidents.

According to defendant, their argument that day had been about payment of their son's private school tuition.  Rajeev had pushed her against a door, thrown her down, and twisted her arm.  She had picked up a water jug and "hit him back."  She had threatened to call 9-1-1 if Rajeev did not stop.  Rajeev then pulled her by the hips.  Defendant then took the water glass and hit him on the head.  Rajeev then screamed out the window that defendant was killing him.

Defendant expressed some confusion about whether she had hit Rajeev with the glass or jug first.  She also stated that Rajeev had hit the glass on his head himself, while pulling on her hand.  She stated that Rajeev had pulled her down onto the bed and pressed her throat.

Defendant revised the order of events several times.  At one point, she stated that she had hit Rajeev on the leg, that Rajeev then threw her on the bed, that she then hit him on the head, and that he then called out the window to the neighbors.  Shortly thereafter, defendant stated that Rajeev was hit on the head with the glass after he had called out the window.  Defendant stated that she had been drinking from the glass when Rajeev lifted her hand, pushed her on the bed, and did "something" to cause the glass to break on his head.

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

Defendant acknowledged biting Rajeev on the arm about three weeks earlier. They had been having a similar argument, and Rajeev had hit her. Rajeev had also previously kicked her, pushed her, and hit her in the chest with his fist. About six weeks before the current incident, defendant had called 9-1-1 to report that Rajeev had scratched her face.

### D.    Prior Violence

According to Rajeev, defendant had been violent to him about two or three weeks before the charged incident. During that incident, defendant had pulled Rajeev's hair, dragged him off of the bed, punched him, and bit his hand and neck. Rajeev did not call the police at the time. He went to family court for help but was told his only option was to file for divorce.

For the six months leading up to the charged incident, defendant had been physically abusive to Rajeev about once a month. Defendant's prior violence included pouncing on Rajeev, scratching his face, and throwing things around. In October of 2009, defendant spat on his face.

Rajeev acknowledged that he had been arrested for committing domestic violence against defendant two times. In April of 2002, when they lived in Virginia, defendant told the police that Rajeev had scratched her face. In October of 2006, when they lived in North Carolina, defendant told the police that Rajeev had pushed her from the back. Rajeev asserted that in both cases, defendant's allegations had been untrue and the charges were dismissed. In the North Carolina case, defendant had signed an affidavit in which she said Rajeev had not abused her. Rajeev denied writing the statement for defendant to sign, but he admitted that he had refused to buy a house for the family until defendant retracted her allegations.

According to Rajeev, who was a project manager, defendant also abused him financially. After she began working in May of 2008, she put all of her income into her personal account instead of their joint account. Since he was paying all of their expenses

5

and had about $20,000 in credit card debt, this left him with no money. Rajeev closed the joint account in November of 2009. At the time, defendant had about $30,000 in her separate account.

### E. Defendant's Testimony

Defendant testified that Rajeev began abusing her five or six months into their marriage. When they were living in Pennsylvania, Rajeev slapped her, twisted her arm, and punched her in the stomach. When they were living in Virginia, Rajeev pushed her, twisted her wrist, pulled her arm back, and hit her in the stomach and chest. Rajeev committed similar acts when they were living in North Carolina. When they were living in North Carolina, defendant went to the doctor for a rectal tear caused by anal sex that Rajeev forced her to engage in. On average, Rajeev abused her about once a month throughout their marriage.

Defendant did not tell anyone about most of the abuse or report it to police. However, while they were living in Virginia in April of 2002, Rajeev called the police when defendant was at a train station with her son. Rajeev had beaten her and scratched her face. The police officer who responded saw the scratch on her face and a bruise on her arm. Although defendant refused to tell the police what had happened, Rajeev was arrested. Defendant subsequently asked for the charges to be dismissed.

Defendant went to the police and obtained a restraining order against Rajeev when they were living in North Carolina. Rajeev had beaten her and pushed her out of the house. He did not allow defendant into their home and threatened to have her arrested for trying to kidnap the children. Rajeev was arrested, but defendant again asked for the charges to be dismissed. Defendant signed an affidavit that Rajeev wrote for her, recanting her allegations. At trial, defendant testified that the affidavit was not true; Rajeev had pushed her and abused her.

Defendant claimed that Rajeev's abuse of her became worse after they moved to California. In addition to physical abuse, Rajeev would threaten to get her arrested and to

6

distort her face.  The physical altercations occurred almost weekly, and she had to seek medical attention.  She was in constant physical therapy and chiropractic care.  She never told any of the medical providers what had really happened; she would say that she had fallen down or slipped on stairs.

Regarding the charged offense, defendant testified that the incident began two days earlier during an argument concerning their son's application for middle school.  Rajeev had refused to help or pay the tuition.  Defendant worked only temporary jobs and her income varied.  Defendant had also refused to have sex with Rajeev.  Rajeev did not speak to her for two days.

On the day of her arrest, defendant went to Rajeev's room to discuss their son's private school application again.  Rajeev began cursing at her.  He grabbed her neck and pushed her against the closet, causing the door to break.  He hit her, pushed her, pulled her onto the bed, got on top of her, punched her, squeezed her neck, and put a pillow over her face.  Defendant struggled to get free and managed to hit him on the legs.  She also managed to hit him with the drinking glass.

At trial, defendant stated she was not sure of the exact sequence of events, claiming she had been in too much shock at the time.  Due to her shock and confusion, she had not been able to provide a clear sequence of events during her interview at the police station.

Defendant claimed she went to the doctor after her arrest because she was suffering from pain around her face, neck, shoulder, lower back, wrist, and arms.  She admitted her only visible injury was a cut on her finger.

Defendant admitted biting Rajeev on the arm during an incident in which he dragged her down the stairs.  Defendant denied ever spitting on Rajeev's face.

Regarding financial issues, defendant claimed that she deposited her paychecks into her joint account with Rajeev until she discovered that Rajeev had not paid for the

7

children's school tuition or their mortgage. She had no access to the joint account other than a debit card. At that point, she opened up a separate account.

Defendant had applied for a domestic violence restraining order after her arrest. In the application, she made statements that were contradicted by evidence at trial. First, she claimed the police had arrested her without asking her any questions. This was not true. Second, she claimed that when the neighbor came over, she had asked him to stay until the police arrived. According to the neighbor, defendant told him to go away. Third, she claimed that Rajeev had punched her in the cheek and choked her. However, defendant never told that to the police.

Defendant tried to explain these contradictions by claiming that she had been in shock and fear and that Officer Fanucchi had threatened to "get [her] with more charges like under the influence" if she did not agree with what he said. Officer Fanucchi denied that he ever threatened to add any more charges.

### F. Defense Expert Testimony

Richard Ferry, a licensed marriage and family therapist, testified for the defense as an expert in the areas of domestic violence, post-traumatic stress disorder, and the behaviors of abusers and abused persons.

Ferry listed eight areas of Intimate Partner Violence: financial exploitation, using the children, isolation, threats, verbal abuse, harassment and stalking, physical violence, and sexual violence. An example of financial exploitation is controlling the family income. Examples of isolation include cutting off the telephone and interfering with the abused person's friends and family. Insults are an example of verbal abuse. An abuser who uses threats may threaten to kill the abused person, take the children, commit more violence, or destroy the person's reputation. Physical violence can include pushing, choking, hitting, spitting, and breaking furniture. It often increases in severity. Sexual abuse can include making the person engage in degrading acts.

8

Battered women are sometimes violent. For instance, a woman may act in self-defense. Usually this occurs after a long period of abuse that has escalated. A woman may also be violent to assist her in escaping. A woman may use a weapon in order to equalize the power. Although women may sometimes initiate violence, it is usually "low level."

Battered persons face many barriers to leaving an abusive relationship. An abused person will usually want the violence to end, but not the relationship. He or she may have limited access to resources or no place to go. He or she may fear losing the children.

Battered women tend to be depressed, anxious, and hyper-vigilant. Their emotions may be numbed. They may believe they caused the violence. It is very common for a woman not to report the abuse because of shame, fear of retaliation, and/or hope that the violence is an aberration. Recanting is common and a significant obstacle to the prosecution of abusers.

Ferry met with defendant before testifying. Defendant told him about the Intimate Partner Violence she had suffered. Ferry believed the violence was severe in its frequency. He believed she met or exceeded the criteria for post-traumatic stress disorder. Defendant's inconsistent versions of the events could have been attributable to shock or dissociation.

It is not uncommon for an abuser to try to portray him or herself as the victim. Ferry recalled a prior case in which the male abuser called for help, faked an injury, and had the woman arrested.

### G.    *Charges, Trial, and Sentencing*

Defendant was charged with inflicting corporal injury on a spouse (count 1; § 273.5, subd. (a)) and making a criminal threat (count 2; § 422).

A jury trial began on January 23, 2012. The jury began deliberating on the fifth day of trial, January 30, 2012. On the sixth day of trial, January 31, 2012, the jury

9

reached verdicts but was instructed to begin deliberations anew because it had inadvertently received an exhibit that had not been admitted during the trial. Seven minutes after that instruction, the jury reached verdicts again, finding defendant guilty of count 1 (inflicting corporal injury on a spouse) but not guilty of count 2 (criminal threat).

Defendant filed a motion for a new trial based on (1) the jury's receipt of the exhibit that had not been admitted into evidence, and (2) ineffective assistance of counsel. The trial court denied the motion.

At the sentencing hearing on August 13, 2012, the trial court suspended imposition of sentence and placed defendant on probation for three years. As a condition of probation, the court imposed a six-month county jail sentence, and it awarded defendant two days of actual custody credit but no conduct credit.

### III.    DISCUSSION

#### A.    *Jury's Consideration of Extrinsic Evidence*

Defendant contends reversal is required because the jury improperly considered an exhibit that had not been admitted into evidence. The exhibit consisted of bank records from defendant's separate bank accounts.

##### 1.    **Proceedings Below**

During the prosecution's cross-examination of Ferry, the expert witness, the bank records were marked as exhibit 31. The bank records were from a savings account and a checking account in defendant's name. The records from the savings account showed that defendant had a balance of $23,920.91 on March 31, 2010. The records from the checking account showed that defendant had deposited $6,382.10 between March 12, 2010 and April 13, 2010, and that she had withdrawn or spent $4,288.19 during that time period, with a statement-ending balance of $2,857.01. The checking account charges indicated defendant had made purchases at various retail outlets and that she had recently

10

been in Nevada. The final page of the exhibit indicates that defendant had at least four bank accounts in her name as of April 15, 2010.

After an off-the-record discussion, exhibit 31 was not introduced into evidence and Ferry was not asked any questions about it. However, the exhibit was apparently sent into the jury room, along with the exhibits that had been admitted, when the jury retired to deliberate on January 30, 2012.

On January 31, 2012, the second day of deliberations, the parties became aware that the exhibit had been erroneously provided to the jury. Defendant moved for a mistrial. At about the same time as defendant was arguing for a mistrial, the jury indicated it had reached a verdict.

The trial court declined to grant a mistrial. Instead, it called the jurors back in and instructed them as follows: "It sometimes happens that a lot of exhibits are marked, but not all marked exhibits come into evidence. Occasionally, we have some that are marked and not allowed in. This one was sent back to the jury deliberation room by mistake. I don't know whether the error was significant or harmless or anything at all because I don't know the weight you gave to the bank records, Exhibit Number 31, if any. [¶] What I'm going to tell you to do is return to the . . . deliberation room and reconsider your deliberations without any reference at all to Exhibit 31, the bank records. Um, you'll be starting over with no reference to Exhibit 31. Please tell us if you can reach a verdict or if you decide you can't reach a verdict. Thank you."

The instruction was given at 2:51 p.m. on January 31, 2012, and the jury reached its new verdicts seven minutes later, at 2:58 p.m.

Defendant subsequently moved for a new trial, based in part on the jury's erroneous receipt of exhibit 31. At the hearing on the motion, the trial court noted that the bank records had been offered only to impeach the basis for Ferry's opinion. The trial court found that the bank records were not the "centerpiece" of either side's case. The court was confident that the jury had obeyed the instruction.

11

## 2. Analysis

It is "indisputably error" when a jury is allowed to consider extrinsic evidence. (*People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*).)  Thus, on appeal, "[t]he only issue . . . is whether the error was sufficiently prejudicial to warrant a new trial." (*Ibid.*)  The error is considered "trial error" and requires reversal only if "in light of all the other evidence properly admitted, the verdict th[e] jury reached would have been the same absent exposure to the [extrinsic evidence]." (*Id.* at pp. 396-397.)

In *Gamache*, the defendant was convicted of "first degree murder with robbery, burglary, and kidnapping special circumstances, as well as various lesser crimes," and he was sentenced to death.  (*Gamache, supra,* 48 Cal.4th at p. 356.)  After the jury returned its verdicts, "it came to the attention of counsel and the trial court that, during the penalty phase deliberations, the jury had viewed a videotape never admitted into evidence."  (*Id.* at p. 395.)  The videotape showed the defendant and his coparticipants being interviewed by the police on the day they committed the crimes.

The *Gamache* court found no reversible error, primarily because the videotape was cumulative of other evidence, including a videotape of another police interview of the defendant and the coparticipants.  (*Gamache, supra,* 48 Cal.4th at p. 399.)  Upon comparing the two videotapes, the court found "little that was new and nothing that would have changed the outcome of the trial."  (*Ibid.*)  In addition, there was "overwhelming" evidence in the record that the defendant had planned to kill the victims and of his "callousness toward human life."  (*Id.* at pp. 400, 402.)  Thus, the court concluded there was "no reasonable possibility Gamache would have received a more favorable outcome had the [non-admitted] videotape not been erroneously placed in the jury room."  (*Id.* at p. 403.)

The California Supreme Court also found the jury's consideration of extrinsic evidence harmless in *People v. Cooper* (1991) 53 Cal.3d 771 (*Cooper).*  In *Cooper,* the defendant had escaped from prison then killed four people.  (*Id.* at p. 794.)  During

12

deliberations, the jury reported that it had inadvertently considered an exhibit that was not supposed to have been admitted into evidence. The exhibit was a transcript of a hearing from the defendant's prior conviction, which the jury knew about. "The transcript contained a statement that the defendant had complained of 'headaches' and 'hallucinations that interfere with his ability to participate.' " (*Id.* at p. 834.) After the trial court learned that the exhibit had been improperly admitted, it instructed the jury to stop deliberating, withdrew the exhibit, admonished the jury to disregard it, questioned the jurors individually about possible prejudice, and then reiterated its admonishment. (*Ibid.*)

In determining whether the jury's receipt of the extrinsic evidence required reversal, the *Cooper* court characterized the error as "relatively minor" and noted that "the evidence of guilt was extremely strong." (*Cooper, supra,* 53 Cal.3d at p. 836.) The court further noted that because the error had been discovered during deliberations, the exhibit had been withdrawn, and the jury had been instructed to disregard it, "the danger of prejudice" was further reduced. (*Id.* at p. 838.) The "corrective steps" taken by the trial court contributed to the court's conclusion that no prejudice resulted from the error. (*Ibid.*)

Defendant contends the trial court erred in determining that the jury's consideration of the bank records was harmless.[5] According to defendant, the bank records "undercut" Ferry's testimony as well as defendant's testimony. Specifically, the bank records undercut defendant's testimony that she had to open a separate account because Rajeev had not paid some of their family expenses.

---

[5] The Attorney General contends there is no evidence that the jury "ever" considered the bank records. Since there is also no evidence that the jury refrained from looking at the bank records after they were erroneously sent into the jury room, we will assume that the jury did consider them during the initial deliberations.

13

We agree that the bank records were inconsistent with defendant's testimony about Rajeev's financial abuse. However, the bank records were cumulative of other evidence at trial. Rajeev had already testified that defendant had about $30,000 in her separate account and that he was paying the family's bills. Thus, the bank records did not add any significant new evidence; as in *Gamache,* the bank records contained "little that was new." (*Gamache, supra,* 48 Cal.4th at p. 399.)

Defendant also argues that the jury's split verdict "suggests they did not credit Rajeev fully" and shows that the bank records "could easily have tipped the scales" in favor of the jury finding defendant credible. The bank records did corroborate Rajeev's testimony about the family finances and thus did add to the evidence showing that Rajeev was more credible than defendant. However, there was already a significant amount of evidence tending to show Rajeev was credible and defendant was not. In particular, defendant's credibility was diminished because she had provided numerous different versions of the charged incident, whereas Rajeev's version of the incident had been very consistent.

Moreover, with regard to the charged incident, the evidence of Rajeev's injuries corroborated his version of the events. He suffered a cut on his shin and a four-to-five inch cut on his head, for which he sought medical treatment. In contrast, there was no evidence that defendant sustained any significant injuries, despite her trial testimony that Rajeev had hit her, punched her, and squeezed her neck that day. Her only injury was the small cut to her finger, which was apparently caused by her use of the drinking glass to hit Rajeev on the head. Thus, while perhaps not overwhelming, the evidence supporting defendant's conviction was strong. (Cf. *Gamache, supra,* 48 Cal.4th at p. 400.)

Further, although the jury found defendant not guilty of making a criminal threat, this does not necessarily mean that the jury disbelieved Rajeev's testimony. The jury may have believed that defendant made the threat but found that Rajeev was not in

14

"sustained fear" as required by section 422. (See *People v. Toledo* (2001) 26 Cal.4th 221, 235.)

Finally, defendant contends the trial court's instructions to the jury were insufficient to cure the error. She notes that after the jury was given the instruction to restart deliberations and not consider the exhibit, it reached its verdicts in only seven minutes. According to defendant, this timeline "suggests that they did not, in fact, start over in their deliberations." However, it was unnecessary for the jury to begin deliberations entirely anew. An admonishment to continue deliberations and simply disregard the exhibit would have been proper under the circumstances. (See *Cooper, supra,* 53 Cal.3d at p. 836.) Thus, even if the jury did not go through the same extended discussion as it had during the initial deliberations, we will not presume the jury actually considered the bank records in ultimately finding defendant guilty of count 1.

In sum, we conclude there was "no reasonable possibility" defendant would have received a more favorable outcome had the bank records "not been erroneously placed in the jury room." (*Gamache, supra,* 48 Cal.4th at p. 403.)

### B.     Exclusion of Defense Evidence

Defendant contends the trial court erred by excluding evidence that would have shown why, after she told the police in North Carolina that Rajeev had abused her, she signed an affidavit recanting that allegation.

### 1.     Proceedings Below

During motions in limine, the prosecution sought to exclude any mention of defendant's immigration status. The trial court granted the motion, finding that the immigration status of both defendant and Rajeev was "completely irrelevant."

During trial, prior to defendant's testimony, defendant sought to introduce email correspondence between defendant and a North Carolina immigration attorney. Defendant's email to the attorney indicated that she was "confused regarding the charges against her husband, quote, for abuse towards me in the last ten years of our marriage."

15

Defendant asked about the possibility of getting a "u" visa.[6] Defendant expressed fear and asked for advice.

The immigration attorney's email response to defendant was sent on October 31, 2006. The subject line of the email was "Immigration law." The email read as follows: "Until your family has your green cards, it is VERY IMPORTANT for your husband to NOT GET CONVICTED OF A DOMESTIC VIOLENCE OFFENSE. [¶] He needs to get it dismissed or plead down to disorderly conduct. [¶] . . . [¶] If he is convicted of a domestic violence offense it will make him deportable. . . . If he gets deported, your entire family will be deported as well. [¶] Once you all get your permanent residency, we can deal with your options after that. [¶] Talk to the D.A. Let him know that if your husband is convicted, your entire family will be the ones who really suffer."

In urging the trial court to admit the correspondence, defendant argued that her letter to the attorney impeached Rajeev's testimony denying that he had ever abused her. Defendant also argued that the attorney's response explained defendant's state of mind— i.e., it explained why she signed the affidavit retracting her allegations of abuse.

The prosecutor objected to the evidence. He argued that defendant's statements to the attorney were "self-serving hearsay." He further argued that the attorney's response was hearsay. Alternatively, the prosecutor urged the court to exclude the attorney's letter pursuant to Evidence Code section 352, asserting, "It violates almost every in limine ruling made by the court with regards to immigration consequences and with regards to child custody." The prosecutor also argued that by providing the evidence at that late point, defendant had created "a discovery issue" and that the prosecution would not have an opportunity to "do further investigation" into the issue.

---

[6] Pursuant to title 8 of the Code of Federal Regulations, section 214.14, "An alien is eligible for U-1 nonimmigrant status" if he or she "has suffered substantial physical or mental abuse" as a result of having been a victim of domestic violence.

16

The trial court declined to admit the proposed exhibit. The court found that the correspondence would be cumulative if defendant took the stand and testified that she had acted in self-defense. The court also found the correspondence would not impeach Rajeev because it was not his prior inconsistent statement, that defendant's statements were hearsay, and that admitting the correspondence would violate the court's prior ruling concerning evidence of immigration issues. The court further found that the evidence was not relevant: "It doesn't prove an element of the crime. It doesn't prove a defense to the crime." The trial court indicated it was also excluding the evidence because of its potential for prejudice: "It's a very emotionally charged issue. It invites the jurors to consider emotions. Some jurors might feel sorry for a person and find them not guilty because they don't want them to be deported. Other people may have a tendency to think they shouldn't be here at all because foreigners shouldn't be in our country . . . . [¶] People have very strong feelings about that, and I don't want that interfering with their cold, clear judgment in this case."

### 2. Analysis

On appeal, defendant argues the trial court erred by finding that defendant's correspondence with the immigration attorney was not relevant and that it was more prejudicial than probative. She contends the evidence was relevant to her credibility because it explained why she recanted her allegations of abuse when she signed the affidavit in North Carolina. Defendant contends the exhibit was not hearsay because it would not have been admitted for "the truth of the matter stated" (Evid. Code, § 1200, subd. (a)) but to explain defendant's actions. She claims the evidence was critical to her defense and that its exclusion denied her due process.

The Attorney General argues that the trial court "acted within its discretion when it excluded the defense emails." The Attorney General contends the emails were "inadmissible hearsay," that they had only "slight" probative value, that the evidence was

17

cumulative of defendant's testimony and the expert testimony about recantation, and that admitting the jury presented a risk of jury confusion.

We first address the question whether the emails were inadmissible hearsay. Below, defendant sought to introduce the emails for both a hearsay purpose (to show that Rajeev had been abusive to defendant in the past) as well as for a non-hearsay purpose (to explain defendant's recantation of her abuse allegations in 2006). To the extent defendant sought to introduce the evidence for the latter purpose, the evidence was not inadmissible hearsay. (See Evid. Code, §§ 1200, 1250 [hearsay exception for out-of-court statements admitted to prove the declarant's state of mind].)

We next address relevance. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) We agree with defendant that the email from the immigration attorney had some relevance, in that it provided a possible explanation why defendant signed the affidavit in which she retracted her allegations of abuse. The email was thus relevant to defendant's credibility, since she testified that her statements in the affidavit were not true.

We now turn to the question of whether the correspondence was more probative than prejudicial. " 'A trial court has broad discretion under Evidence Code section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." ' " (*People v. Riccardi* (2012) 54 Cal.4th 758, 808-809 (*Riccardi*).) "On appeal, we evaluate rulings under Evidence Code section 352 using the abuse of discretion standard. [Citation.]" (*Ibid.*)

Here, the email correspondence had some probative value, as it provided a possible explanation why defendant retracted her allegations against Rajeev in

18

North Carolina in 2006. However, the trial court did not abuse its discretion by finding that the probative value of that evidence was substantially outweighed by the probability that its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

The email correspondence related to an incident that had occurred four years before the charged offenses, so it did not have significant probative value concerning whether defendant committed the charged offenses. Further, defendant was able to present other evidence concerning possible reasons for her recantation, through the expert testimony of Ferry. Ferry not only testified in general about reasons why a battered woman might not end her relationship with the abuser, but he specifically testified that defendant's affidavit was "a common recantation." Moreover, Rajeev admitted that he pressured defendant to retract the allegations by refusing to buy a house until she had done so. The email correspondence between defendant and the immigration attorney would not have significantly added to this evidence.

The email correspondence also posed the potential for necessitating undue consumption of time and confusing the issues. If defendant had been allowed to introduce the email correspondence and testify that she signed the affidavit because of immigration concerns, the prosecutor would likely have sought to put on evidence rebutting that testimony. The prosecution may also have sought to show that the advice from the immigration attorney was incorrect. The prosecution may also have sought to show that defendant made up the North Carolina abuse allegations in an attempt to obtain lawful immigration status, since she initiated the correspondence by asking the immigration attorney whether she could get a "u" visa. Ultimately, there could have been a mini-trial regarding the North Carolina issues, and the trial court could reasonably determine that the probative value of the correspondence was substantially outweighed by the probability that a mini-trial would have consumed an undue amount of time and

19

confused the jury. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 916 [discretion under section 352 can be exercised "to preclude inefficient mini-trials"].)

Finally, the trial court reasonably found that the evidence presented a substantial danger of undue prejudice because some jurors may have had "strong feelings" about immigration. A juror's concern about defendant's deportation or about "foreigners" could potentially have interfered with that juror's assessment of the issues.

Since we have found no error in the trial court's ruling under Evidence Code section 352, we also find that the exclusion of the email correspondence did not deny defendant her constitutional due process rights. "The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights. [Citation.]" (*Riccardi, supra,* 54 Cal.4th at p. 809.)

In sum, the trial court's exclusion of the correspondence between defendant and the immigration attorney does not require reversal of defendant's conviction.

## C. Cumulative Error

Defendant contends that the cumulative effect of the above errors requires reversal. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)

We have determined that the trial court erred by permitting defendant's bank records to go into the jury room, but that the error was not prejudicial in light of the other evidence presented at trial and because the trial court instructed the jury to deliberate again without reference to the bank records. Since we have also determined that the trial court did not abuse its discretion by excluding the email correspondence between defendant and the immigration attorney, there were no additional errors to cumulate.

## D. Custody Credit

Defendant contends that she is entitled to two additional days of custody credit. The trial court awarded her two days of actual presentence custody credit, but no conduct

credit. As she points out, and as the Attorney General concedes, she was entitled to two days of conduct credit under the version of section 4019 in effect at the time of her offense in April of 2010. (See Stats. 2009-2010, 3rd Ex. Sess., ch. 28, § 50, eff. Jan. 25, 2010; *People v. Garcia* (2012) 209 Cal.App.4th 530, 535-536 ["With exceptions, Senate Bill No. 3X 18 provided presentence conduct credits of two days for every two days served in a county jail . . . ."]; *People v. Dieck* (2009) 46 Cal.4th 934, 937 [section 4019 "entitles a defendant to conduct credit if he or she is sentenced to, or otherwise committed for, a period of at least six days, without regard to the duration of presentence confinement"].) We will modify the judgment to reflect that defendant is entitled to two days of conduct credit.

## IV.    DISPOSITION

The judgment is modified to reflect a total of four days of custody credit, consisting of two days of presentence custody credit and two days of conduct credit.  As modified, the judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MÁRQUEZ, J.

_____
GROVER, J.